# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-01656-MSK-SKC

IRVING MINOTT,

    Plaintiff,

v.

WICHITA WATER CONDITIONING, INC.,

    Defendant.

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Defendant's ("WWC") Motion for Summary Judgment **(# 46)**, Mr. Minott's response **(# 47)**, and WWC's reply **(# 55)**. Also pending is Mr. Minott's Motion for Leave to Restrict **(# 48)**.

## FACTS

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis.

For several years, Mr. Minott was the sole owner of a business named Fluid Integrity, Inc. ("Fluid), which operated a water conditioning business under the trade name Chuck, The Water Man ("the Chuck business") in Colorado. Fluid made extensive use of a photograph of Mr. Minott's face as a sort of logo, displaying it prominently in its promotional materials, on billboards, on the side of trucks, on customer-facing equipment, and so on.

In 2016, Mr. Minott decided to sell, and WWC decided to buy, Fluid and thus the Chuck business. On July 7, 2016, WWC and Fluid entered into an Asset Purchase Agreement, by which WWC acquired "all of [Fluid's] right, title and interest in and to the assets owned by

[Fluid] and used in connection with [the Chuck business]" in exchange for a payment by WWC. Included within the terms of that sale were all "trade names (including 'Chuck, the Water Man') [and] trademarks" held by Fluid. Mr. Minott contends (and WWC disputes) that during negotiations over the Asset Purchase Agreement, he explained to WWC that Fluid held only a license to use the photo of his face, not ownership of that likeness, and that therefore, "use of my personal likeness was not included in Fluid's" assets. Mr. Minott offered to separately license the use of his likeness to WWC for a one-year period for a separate payment of $100,000. According to Mr. Minott, WWC "rejected the offer and indicated that [WWC] had no use for my likeness." Notwithstanding that discussion, the Asset Purchase Agreement contained no language excluding Mr. Minott's likeness – to the extent it was used as a trademark – from the terms of the sale. Mr. Minott also agreed to not compete with WWC in the water conditioning business in Colorado for a period of 5 years.

When the sale was completed, WWC operated the Chuck business, eventually merging the Chuck name with its Culligan brand (*e.g.* referring to the business as "Chuck's Culligan" or "Chuck the Culligan Man"). In May 2017, WWC prepared a promotional image that used the photo of Mr. Minott's face, edited onto the body of another model (who wore a Culligan-branded shirt), alongside the statement "Chuck The Water Man is now Chuck The CULLIGAN Man." WWC's Manager, Jeff Caruthers, sent a version of the image to Mr. Minott and invited comment. Mr. Minott responded "unless [you're] hiring me as a professional model (very expensive) NO. . . Our discussion was a verbal chat. We discussed that you could use that one picture of my face as the logo for one year from acquisition date. . . You dismissed those discussions without conclusion . . . I do appreciate you asking and I like the fact that you see value in my name & face being attached to the company, but NO." Mr. Caruthers forwarded Mr.

2

Minott's e-mail to WWC's marketing vendor, stating "I kind of assumed this. So let's take his face off there" and proposed another image that did not use Mr. Minott's likeness.

But in November 2017, WWC sent out a series of mailers to its customers, using the photo of Mr. Minott's face (and the model's body). Mr. Minott learned of the mailers and complained to Mr. Caruthers repeating that WWC was not authorized to use the photo of his face. Mr. Caruthers advised Mr. Minott that he had instructed WWC's marketing vendor to "change all future mailers to not use your picture," but also advised Mr. Minott that "there may be some [existing mailers] in the system to be mailed but it has been changed." However, while he was giving these assurances to Mr. Minott, Mr. Caruthers e-mailed WWC's marketing vendor to determine how many mailers featuring Mr. Minott had already been printed. The vendor responded that "the December batch is all printed. How do you want to proceed?" and Mr. Caruthers responded "just leave it," apparently instructing that the existing mailers with Mr. Minott's photo be sent out to potential customers.

Mr. Minott commenced this action **(# 1)** asserting three claims: (i) misappropriation of likeness under Colorado common law, in that WWC has made unauthorized use of the photo of Mr. Minott, thereby appropriating Mr. Minott's likeness for WWC's commercial benefit; (ii) that WWC's use of Mr. Minott's likeness created a false or misleading perception in customers that Mr. Minott endorsed WWC, amounting to false advertising under the Lanham Act, 15 U.S.C. §1125(a)(1); and (iii) deceptive advertising under in violation of the Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-101 *et seq.*, based on the same facts.

WWC now moves **(# 46)** for summary judgment on Mr. Minott's claims, arguing that: (i) it is entitled to judgment on all of Mr. Minott's claims because the photo of Mr. Minott amounted to a trademark held by Fluid, and was thus acquired by WWC as part of the Asset

3

Purchase Agreement; (ii) that Mr. Minott's Lanham Act claim fails because the advertisements it sent out in late 2017 were sent only within Colorado and thus lacked any effect on interstate commerce, because there is no likelihood of confusion by customers as to whether Mr. Minott himself is associated with WWC, and because Mr. Minott's agreement not to compete with WWC following the asset sale prevents Mr. Minott from sustaining any injury resulting from any alleged misuse of his likeness; and (iii) Mr. Minott's CCPA claim fails because he cannot show that WWC engaged in a deceptive practice, that any customers were deceived, or that Mr. Minott suffered any injury.

Separately, Mr. Minott moves **(# 48)** to restrict public access to certain portions of his summary judgment response and supporting exhibits under D.C. Colo. L. Civ. R. 7.2.

## **ANALYSIS**

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. Misappropriation of likeness**

The burden of proof is on Mr. Minnot. To prove the tort of misappropriation of likeness (sometimes referred to as "invasion of privacy"), he must show: (i) that WWC used his name or likeness; (ii) that WWC did so for its own purposes or benefit, commercially or otherwise; and

(iii) Mr. Minott suffered injuries caused by the use of his likeness. *King v. PA Consulting Group, Inc.*, 485 F.3d 577, 591 (10th Cir. 2007).

WWC asserts the affirmative defense of consent[1] on which it has the burden of proof. It contends that Mr. Minott consented to WWC making use of his likeness because he had allowed Fluid to use that likeness as a trademark and that the Asset Purchase Agreement conveyed Fluid's rights in that trademark – and thus, Mr. Minott's likeness – to WWC. Because WWC seeks judgment in its own favor on its own affirmative defense, it must show that there is no genuine factual dispute as to any of the elements of its defense. The defense of consent, in this context, requires WWC to prove that: (i) Mr. Minott, by words or conduct, led WWC reasonably to believe that he had authorized WWC to make use of his photograph as a trademark; and (ii) WWC acted in a manner and for a purpose to which Mr. Minott agreed. *Colo. Jury Instr.* 28:13.

WWC's argument on this issue is fairly simple: Fluid used Mr. Minott's photo as Fluid's trademark, that Fluid conveyed all of its trademarks to WWC in the Asset Purchase Agreement, and that therefore, WWC obtained the right to continue to use Mr. Minott's image when it acquired Fluid. Although each of the premises of this argument are correct – the record is clear that Fluid established a use of Mr. Minott's photograph as a trademark, *see e.g. ETW Corp. v. Jireh Publications, Inc.*, 332 F.3d 915, 922 (6th Cir. 2003) (explaining that although general images of a famous individual do not generally acquire trademark status, prolonged use of a single, specific image of the individual can become sufficiently associated with the individual's

---

[1] WWC argues at some length that it also entitled to judgment on its affirmative defense of waiver. This Court perceives little difference between consent and waiver in this context. *See generally* Colo. Jury Insr. 28:13 n. 3 ("some cases use the term 'waiver' in lieu of 'consent,' but apply the same principle," citing *Borquez v. Robert C. Ozer, P.C.*, 923 P.2d 166, 175 (Colo.App. 1995)).

own services to acquire trademark status) and it is clear that WWC acquired Fluid's right to use the image as a trademark – but the argument fails to "close the loop" and establish that WWC's continued use of the image as a trademark overcomes all other intellectual property rights that might attach to it.

Several facts in the record call into question whether WWC's acquisition of trademark rights to the photograph establish Mr. Minott's consent to the continued use of his likeness. Mr. Minott has testified (and WWC has not rebutted) that Fluid never owned the image of Mr. Minott that it used as a trademark. Rather, Mr. Minott contends that he merely licensed the use of that image to Fluid. The record does not disclose the terms of that license and, more importantly, its duration. Mr. Minott appears to contend that the license was terminable at will and that he terminated that license upon the closure of the sale of Fluid, and WWC has not adduced any evidence to the contrary. Thus, although Fluid may have conveyed the right to use the photo as a trademark, WWC acquired nothing more than Fluid had. WWC did not acquire rights to the photograph itself, nor the right to depict Mr. Minott's likeness.

This highlights the many layers of intellectual property protections that can apply to a single image. For example, consider Alfred Eisenstaedt's seminal photograph *V-J Day In Times Square*, which famously depicts a sailor passionately kissing a nurse in Times Square during a victory parade. Imagine that a mouthwash company decided to use that image as their trademark. Nothing in trademark law would prevent it from simply doing so: all that is necessary is that the mouthwash company make sufficient efforts to associate its brand of mouthwash with the image, such that consumers could use the image to distinguish between different brands of mouthwash. But success in establishing the image as a trademark does not leave the mouthwash company in the clear. Mr. Eisenstaedt, as the photographer, might hold the

copyright to the image itself, and the mouthwash company's success in establishing a trademark does not vitiate Mr. Eisenstaedt's copyright rights to control how the image is reproduced. Moreover (putting aside various legal technicalities), it could be that the sailor and nurse in the photograph have common-law privacy interests in their likenesses as well, interests that neither Mr. Eisenstaedt or the mouthwash company are able to trump with their own respective copyright and trademark rights in the image. *See e.g. Mendonsa v. Time, Inc.*, 678 F.Supp. 967 (D.R.I. 1988) (denying publisher's motion to dismiss invasion of privacy claim by plaintiff claiming to be Mr. Eisenstaedt's sailor). For the mouthwash company to ensure that it can fully use the image as a trademark, it must also ensure that it has secured any copyright interests attached to the photo and the privacy interests of the persons depicted within it.

Assuming that WWC acquired Fluid's right to use the photograph of Mr. Minott as a trademark, all that WWC acquired was the protections that trademark law gives: the right to prevent competing water conditioning businesses from using that same photo of Mr. Minott to promote themselves. Mr. Minott testifies that as to Fluid, he personally holds the copyright to the photograph of his face and that he naturally holds the privacy interests attendant to his own likeness. Mr. Minott asserts, and WWC has not materially disputed, that Mr. Minott only licensed those rights to Fluid and withdrew those licenses at the close of the sale of Fluid to WWC. Nothing in the Asset Purchase required Mr. Minott to convey those rights to WWC as part of the sale, and thus, there is at least a disputed issue of fact as to whether he did so. Indeed, there is also least a dispute of fact as to whether Mr. Minott specifically told Mr. Caruthers at the time the Asset Purchase Agreement closed that Fluid did not own the rights to his likeness and that WWC would not be able to use the photo without making an additional payment to him. In light of these facts, the Court cannot conclude that WWC has proven the first element of a

defense of consent to the tort of invasion of privacy: that it had a reasonable basis to believe that the Asset Purchase Agreement's conveyance of trademark rights in the image constituted Mr. Minott's consent to convey his separately-retained interests in his likeness.

WWC also fails to conclusively establish the second element of the defense of consent: that its use of Mr. Minott's photo was consistent with the scope of any consent that WWC reasonably believed Mr. Minott had given. On at least two occasions, once in May 2017 and again in November 2017, Mr. Caruthers and Mr. Minott exchanged e-mails about WWC's use of Mr. Minott's photo to promote WWC's business. On both occasions, Mr. Caruthers acknowledged Mr. Minott's position that WWC lacked the rights to use the photo and indicated that WWC would no longer do so. Taken in the light most favorable to Mr. Minott, Mr. Caruthers' concession of the issue could be evidence that Mr. Caruthers, and thus WWC, understood that their use of the photo exceeded the scope of what the Asset Purchase Agreement allowed them to do. Thus, the Court cannot conclude that WWC is entitled to summary judgment on its affirmative defense of consent.

WWC's reliance on *JA Apparel Corp. v. Abboud*, 682 F.Supp.2d 294 (S.D.N.Y. 2010), is misplaced. There, Mr. Abboud, a famous fashion designer, conveyed his interest in his clothing business and its array of trademarks to the plaintiff. Among the marks that Mr. Abboud conveyed was his own name, which the business had used as a trademark. When Mr. Abboud sought to start a new, competing clothing line and use his own name in its promotion, the plaintiff sued, claiming that it had exclusive rights in the JOSEPH ABBOUD mark. The court ultimately held that although Mr. Abboud could continue to use his own name in certain non-trademark situations, he had effectively conveyed the right to use the JOSEPH ABBOUD mark to the plaintiffs. *JA Apparel* is inapposite here because, among other reasons, Mr. Abboud was a

party to the sale of the clothing business to the plaintiff, and thus, specifically participated in the decision to sell all trademark rights to the use of his name. Here, because Mr. Minott was not a party to the Fluid – WWC transaction, no argument can be made that Mr. Minott separately agreed to license his likeness to WWC along with Fluid's conveyance of its trademark interest in that license.[2]

Accordingly, WWC's motion for summary judgment on Mr. Minott's misappropriation of likeness claim is denied.

C. **Lanham Act claim**

Mr. Minott brings a claim that WWC's use of his photograph constitutes a "false endorsement" of its product in violation of the Lanham Act. 15 U.S.C. § 1125(a) prohibits "any person who, in connection with any goods or services . . . who uses in commerce any word, term, name, symbol, or device . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." Here, Mr. Minott contends that the use of his photo in WWC's advertising falsely conveys to consumers that Mr. Minott endorses WWC's business services. To establish a claim of false endorsement, Mr. Minott must show: (i) WWC used "another's distinctive mark, name, trade dress, or other device" – that is, Mr. Minott's image; (ii) that it did so wrongfully and without authorization;

---

[2] The portion of *JA Apparel* that WWC relies upon – that where "an individual has previously sold use of his name and its goodwill, ... courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it,'" 682 F.Supp.2d at 312 -- concerns Mr. Abboud's contention that his use of his own name to promote his new clothing line constituted "fair use" of the JOSEPH ABBOUD mark pursuant to 15 U.S.C. § 1115(b)(4). Among the factors in the fair use inquiry is whether the infringer's use of the trademark is in "good faith," and thus, the inquiry of whether Mr. Abboud was trying to undercut the purpose of the sale of his name was pertinent to the analysis. WWC raises no fair use defense here, making this portion of *JA Apparel* irrelevant.

10

(iii) that its use of that image constituted a statement ("Mr. Minott endorses WWC") that was either literally false or created a false impression; and (iv) that false impression was likely to deceive consumers. *See Dryer v. National Football League*, 814 F.3d 938, 944 (8th Cir. 2016).

WWC seeks summary judgment on this claim via two arguments. First, it contends that its use of Mr. Minott's image was not wrongful because it was entitled to use the image by virtue of the rights conveyed in the Asset Purchase Agreement. For the reasons set forth above, the Court finds that there is a genuine dispute of fact as to whether WWC had the right to use Mr. Minott's image.

Second, WWC argues that Mr. Minott cannot show that any allegedly misleading communications in made were made in interstate commerce. It is undisputed that the Chuck's business, under both the direction of Fluid and later under WWC, only provided services to customers in Colorado. The Lanham Act encompasses purely intrastate activity that substantially affects interstate commerce, and thus, infringement or other Lanham Act violations that occur solely within one state can still be shown to have adverse interstate effects.³ *Coca-Cola Co. v. Stewart*, 621 F.2d 287, 290 (8th Cir. 1980). However, Mr. Minott's substantive

---

³ *Coca-Cola* involved a claim by the soda maker that a single local restaurant's practice of silently substituting a competing soda for customers who ordered a "Coke" constituted a prohibited "passing off" form of trademark infringement under the Lanham Act. Although the court recognized that the restaurant's activities occurred purely intrastate, it found that the restaurant's conduct affected the value of Coca-Cola's interstate trademark. Thus, courts explain this interpretation of the "in commerce" element of the Lanham Act as the principle that purely intrastate conduct that nevertheless significantly affects the plaintiff's rights in a trademark used in interstate commerce satisfies the statutory requirement. *See Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 559 (1st Cir. 1982).

Here, there is no indication that Mr. Minott ever had a trademark or other legal interest that was interstate in character. All of Mr. Minott's work on behalf of Fluid was limited to customers in Colorado (and to the extent Mr. Minott maintains a water conditioning business in Maine where he currently resides, it appears that that business is purely intrastate as well). Thus, WWC's conduct towards Mr. Minott affected only his interests in intrastate commerce.

argument regarding interstate commerce is limited to his contention that of the roughly 3,600 mailers WWC sent out to customers in November and December 2017, 9 of those mailers were sent to addresses in Wyoming, South Dakota, or New Jersey.[4]

This Court cannot conclude that 9 instances of a mass mailing sent to addresses outside of Colorado constitutes the sort of "substantial" affect on interstate commerce that is contemplated by the Lanham Act. Mr. Minott cites to a portion of Mr. Caruthers' deposition testimony in which Mr. Caruthers explains how the recipients of the mailers were selected, and Mr. Caruthers' testimony is that the list of recipients was derived from "current customers" of the Chuck's business and, more specifically, from its billing software.

It is undisputed that the Chuck's business, both before and after the sale to WWC, provided services only to customers in Colorado. Thus, the record suggests that any mailers that were sent to addresses outside Colorado were done so unintentionally or erroneously, perhaps due to errors in the billing data or to customers who had moved out of the service area and had provided a non-Colorado forwarding address for final bills. Given the minimal number of advertisements involved, and the clear indication that any stray mailings leaving Colorado were inadvertent oversights, the Court concludes that Mr. Minott has not come forward with evidence indicating that any false endorsements perpetrated by WWC occurred in interstate commerce. *See e.g. Thompson Tank & Mfg. Co. v. Thompson*, 693 F.2d 991, 992 (9th Cir. 1982) ("a few

---

[4] Mr. Minott makes a single-sentence reference to the fact that WWC has operations in several states, but provides no meaningful information about the nature of those operations, WWC's structure, or whether there are corporate formalities observed among individual franchises or service areas. Although caselaw establishes that purely intrastate activity can constitute interstate commerce if its indirect effects cross state lines, the record is so scant as to how WWC's mailers here may have advanced WWC's business interests outside of Colorado as to preclude a finding of an effect on interstate commerce simply because WWC has interstate operations.

misdirected telephone calls or letters" were not "sufficient to render clearly erroneous the court's findings that [the defendant's] intrastate business in no way affects [the plaintiff's] interstate business").

Accordingly, because Mr. Minott has not shown that WWC's alleged false endorsement had an effect on interstate commerce, WWC is entitled to summary judgment on his Lanham Act claim.

### D. CCPA claim

The CCPA prohibits a wide array of deceptive trade practices, such as making false representations as to the sponsorship, approval, or affiliation of one's own goods and services. C.R.S. § 6-1-105(1)(b), (c), (e). To establish a CCPA claim, Mr. Minott must show: (i) that WWC engaged in one of the deceptive trade practices prohibited by the statute; (ii) that the challenged practice occurred in the course of WWC's business; (iii) that the practice significantly impacts the public as actual or potential consumers of WWC's goods or services, (iv) that Mr. Minott suffered injury in fact to a legally-protected interest; and (v) that WWC's acts were the cause of that injury. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003).

The Court will assume that Mr. Minott can establish the first three elements of a CCPA claim – that is, that WWC's mailers falsely suggested that Mr. Minott himself, whom many Chuck's customers knew and trusted, endorsed WWC's new iteration of the Chuck's business. , But Mr. Minott falters when it comes to the fourth and fifth elements, as he has not identified a cognizable injury that he has suffered. Mr. Minott is not a consumer who might have been deceived by the allegedly false mailings, nor is he a current competitor with WWC for business among the public that received the mailings. Rather, his only alleged injury is a belief that his

reputation has been harmed and that the harm to that reputation may manifest itself in the future when Mr. Minott is released from his non-compete agreement in mid-2021, at which point he intends to return to Colorado and start another water conditioning business. In this regard, Mr. Minott's claimed injury is speculative several times over. He contends that being associated with WWC in the mailers caused harm to his reputation, but he offers nothing more than his own speculation that this is the case. He has not, for example, adduced anecdotal evidence that disgruntled WWC customers have contacted him, expressing their dissatisfaction with "his" business,[5] or that he has conducted customer surveys that reveal that customers have lost respect for the individual they know as "Chuck, the Water Man." Second, Mr. Minott's statement that he intends to resume business in Colorado come 2021 simply underscores the fact that he has <u>not yet</u> suffered any actual injury. Indeed, if Mr. Minott's plans change and he decides not to start a new business in Colorado, his anticipated injury will fail to manifest at all. Finally, even assuming that Mr. Minott does return to Colorado and start a new water conditioning business, Mr. Minott himself testified that "I don't intend to do any soliciting to any past customers at all." Thus, even if Mr. Minott's reputation has been harmed among the customers that previously knew him as Chuck, the Water Man, the record indicates that any future business he conducts will be among a completely different population of consumers – ones who, presumably, have no knowledge of his past reputation at all. Accordingly, the Court finds that Mr. Minott has not

---

[5] Mr. Minott cites to Yelp reviews of what is identified as Chuck's Culligan Water. Putting aside substantial hearsay concerns as to whether such reviews are admissible as proof of the reviewer's perception of Mr. Minott's (a.k.a. "Chuck"), several of the reviews make it clear that they are aware of and distinguish between Mr. Minott's iteration of the Chuck's business and WWC's. (Other adverse reviews relate to a time when Mr. Minott himself owned and operated the business.) Thus, the Yelp reviews do not suffice to demonstrate that <u>Mr. Minott</u>'s professional reputation has been harmed as a result of WWC suggesting his affiliation with or endorsement of WWC.

demonstrated that he suffered any actual injury as a result of any deceptive trade practice, and thus, WWC is entitled to summary judgment on his CCPA claim.

**E. Motion to restrict**

Mr. Minott moves **(# 48)** to restrict public access to a portion of his response brief and Exhibits 37-39 of his summary judgment response. Specifically, he seeks: (i) to redact two instances on page 9 of his response brief that identify the specific amount of revenues generated by WWC from the Chuck's business between 2016 and 2019; (ii) to restrict access to Exhibit 37, which consists of an e-mail string between two WWC employees discussing plans for the late 2017 mailings, along with a spreadsheet that appears to comprise all or most of the customer list of the Chuck's business, including customer names, addresses, and phone numbers; (iii) to restrict access to Exhibit 38, which appears to be the first page and the last page of an exhibit purportedly listing the names Chuck's business customers and what might be the revenue derived from them over an unspecified period of time (although the contents are not meaningfully described in Mr. Minott's response brief; and (iv) to restrict access to Exhibit 39, which consists of a single page listing what might be seven Chuck's customers, along with what appear to be dollar amounts,[6] but whose meaning is otherwise not apparent.

The Court need not recite the familiar standard governing motions to restrict access, except to acknowledge that Local Rule 7.2 reflects the Court's intention to balance the public's strong interest in having access to materials that were submitted to and considered by the Court and the parties' interest in maintaining privacy in certain limited matters where public disclosure

---

[6] There is what appears to be a "total" dollar figure below the seven listed dollar amounts. The total figure is several orders of magnitude larger than the total of the seven listed dollar amounts, suggesting that this exhibit is the final page of a larger exhibit whose full contents are not disclosed or even identified in the record.

15

would result in undue harm. Here, assuming that all of the matters identified in Mr. Minott's motion relate to restricting access to WWC's customer list and specific identification of revenues, the Court is satisfied that Mr. Minott has shown that WWC has an adequate privacy interest in such material.

Moreover, the Court finds that WWC's privacy interest outweighs the public's interest in access to the material, largely because the material submitted is largely irrelevant. The <u>specific</u> amount of WWC's revenues, although referenced in Mr. Minott's response brief, is not germane to the issues before the Court. In such circumstances, Mr. Minott could have avoided disclosing those figures entirely without meaningfully compromising his arguments. The public's interest in access is minimal when the materials in question are irrelevant to the issues before the Court and are not meaningfully considered by the Court except for purposes of evaluating a motion to restrict. *See Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 755 (10th Cir. 2009).

The customer lists, on the other hand, are germane to the issues before the Court, at least for the purpose of demonstrating how many of the late 2017 mailings were sent to Colorado and how many were sent interstate. But Exhibit 37 presents a situation in which strict compliance with Local Rule 7.2(c)(4) would have eliminated the need for restricted access (or even a motion by Mr. Minott). The local rule requires parties to consider whether alternatives to restricted access, such as stipulation or redaction, could eliminate the need to file a document under restriction. Here, the customer list spreadsheet has 13 fields on it, but only one of those fields – the state where the customer is billed – is germane to the reasons why Mr. Minott offers the exhibit. Here, redaction of the contents of the remaining 12 fields of the spreadsheet would have allowed the document to be filed publicly, as WWC would have minimal privacy in the remaining unredacted column. Or, the parties could have readily stipulated to the fact that 9 of

16

the 3,600 customers listed on the spreadsheet had billing addresses outside of Colorado. The Court could require Mr. Minott to publicly-file Exhibit 37 in a redacted form as described above, but given the contents of that document, such a filing would do little to advance the public interest. Accordingly, the Court will simply grant Mr. Minott's motion and preserve the current restrictions on the referenced documents.

## CONCLUSION

For the foregoing reasons, WWC's Motion for Summary Judgment **(# 46)** is **GRANTED IN PART AND DENIED IN PART**. WWC is entitled to summary judgment on Mr. Minott's Lanham Act and CCPA claims, but Mr. Minott's misappropriation of likeness claim will proceed to trial.[7] Mr. Minott's Motion to Restrict Access **(# 48)** is **GRANTED**, and the provision restrictions found at Docket # 49-52 shall remain in place. The parties shall begin preparation of a Proposed Pretrial Order and shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 7th day of February, 2020.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Senior United States District Judge

---

[7] Neither party has requested immediate entry of a partial judgment pursuant to Fed. R. Civ. P. 54(b), and thus, the Court will defer entry of judgment in favor of WWC on the Lanham Act and CCPA claims until the conclusion of remaining proceedings.
The Court also notes that, notwithstanding the granting of judgment to WWC on the Lanham Act claim, the Court retains original subject-matter jurisdiction over Mr. Minott's remaining common-law claim because the parties are of diverse citizenship under 28 U.S.C. § 1332 and the amount in controversy on the remaining claim still appears to exceed $75,000.